Mr. Justice Hagner
delivered the opinion of the Court:
This bill was filed to compel the execution by the defendant of a proper conveyance to the complainant of lot number 12, in block 26, of Columbia Heights, lying near the northern boundary of the City of Washington.
It alleges that the defendant, Lucia, being the equitable owner of the property, through her agent, John E. Beall, contracted to sell it to the complainant upon the terms set forth in the following writing:
*211 “ Washington, D. C., July 31, 1886.
“Received of Thomas J. Fisher & Co., agent for George E. Hamilton, $100, being deposit to secure sale of lot 12, block 26, of Columbia Fleights, containing 15,062 square' feet, at foi^-five cents per square foot.
“Terms of sale: One-third cash, balance in notes, payable in one and two years, with interest at 6 per cent, (drawn payable on or before one or two years, if owner will ratify). Interest payable semi-annually.
“Title to be perfect; taxes to be paid to July 1, 1886. Terms to be complied with in ten days.
“John E. Beall, Agent.”
■ That the $100 therein mentioned was paid to the defendant, Lucia, through her agent, Beall, and that the complainant, Hamilton, within the period stipulated, tendered to her the residue of the cash payment, and offered to execute the promissory notes spoken of in the agreement, and to perform all its stipulations; and that she refused to make the conveyance or perform the contract; that as the equitable owner she exercised absolute control and management of the property, with the full knowledge of the defendant, Martha, who holds the legal title, and ratified and approved the action of the said Lucia.
Mrs. Martha J. Cutts, in her answer, admits that she. holds the legal title of the land, but avers that she, and not her daughter, has had and exercised absolute management and control over the property; that her intention with respect to it, as expressed to the respondent Lucia, was to devote it or its proceeds to her benefit, the respondent retaining its absolute control and supervision, and with no intention to devest herself of such control and supervision; that she had but partial knowledge of the action of the respondent Lucia in respect to said property; and that she has not ratified or approved any agreement for the sale, as *212 in. the bill set forth; and she calls for strict proof of its allegations.
The defendant, Lucia, in her answer, admits that she is interested in the property; avers that it is held for her benefit by her mother, Mrs. Martha J. Cutts; but that the legal title and its absolute management and control is in her mother, subject to which she considers the property her own; and that she has no reason to doubt that her mother would ultimately approve any act of hers for an advantageous change of the investment. She denies that she contracted, or that Beall was authorized by her to contract, to sell the property to the complainant or to any other person; or to sell it to any person upon the terms and conditions contained in the agreement referred to by the complainant. She denies she has received the $100, or that any money has been tendered to her, and disclaims all knowledge of the tender to Beall. Her denial as to the allegations of her absolute control and management of the property corresponds with those in the answer of Mrs. Cutts.
The cause was heard below upon the pleadings, and a considerable amount of evidence; and this appeal is from the decree of the justice dismissing the bill. The legal title to the land is undoubtedly in Mrs. Cutts, under a deed executed to her after the death of her husband. There -is no pretense that Mrs. Cutts herself, or any agent acting under an authority or employment from her, entered into any contract to sell the land. But the contention is that Miss Cutts, being the equitable owner of the lot, and as such exercising absolute management and control over it, employed Beall as her agent to make the sale, and that her mother had full knowledge of what her daughter did, and ratified and approved it, and is therefore bound by her acts. The sworn statements of both answers are positive denials of these assertions, and being responsive to the averments of the bill, they are to be taken as true unless disproved *213 according to the requirements of the rules of chancery evidence.
The testimony of Mr. Beall as to Dr. Cutts’ statement of the right of his sister in the lots, even if it were not contradicted by the doctor’s evidence, would only amount to the brothers understanding of the state of the title, made out of the presence of mother and daughter, which could .not prevail to diminish or increase the actual rights of either. And there is absolutely nothing' in the case to show that there was any legal or equitable impediment existing that could have prevented Mrs. Cutts from selling the property'absolutely and spending the money herself, or from deeding it to one of her other children, of dying intestate of it, or by will leaving it to any stranger, if she see fit to do so, free of all claims of her daughter. ■ Her expressions to her daughter Lucia, of the intention to devote the lot or its proceeds to her benefit, fall very far short of creating in the daughter such an interest in the property as would entitle her to interfere with her mother’s right of disposition.
Even if such an intention had been expressed in a regularly executed deed or other writing, its terms, as stated, are too uncertain to be enforced; and no cestui que trust would have the right to make sale of the land or control its management, against the wishes or rights of the trustee holding the legal title'. If such were to be the construction of the relative rights of trustees and beneficiaries, it would be useless to endeavor by such arrangements to retain alienations of the trust estate by vesting it in trustees.
The only evidence tending to prove any knowledge on the part of Mrs. Cutts of the negotiation between the daughter and Beall is contained in this letter of the 15th of June, 1886, written by the mother in the name and behalf of the daughter from the house of Mr. Story, the son-in-law.
Brookline, Mass., June 15.
Mr. Beall.
Dear Sir: Your telegram was received yesterday and I *214 wanted, to consult my brother-in-law, Moorfield Storey, of the firm of Ball, Storey & Tower, lawyers, Boston, about contents. I do not understand exactly what the amount of the offer is. Will you be so kind as to let me know, and what your commission will be?
Miss L. B. Cutts.”
It is admitted that this letter was erroneously addressed to Mr. Beall, as the telegram therein referred to was not received from him, but from another of the several real estate agents with whom Miss Cutts had been in communication as to the sale of the lot before she and her mother had left Washington for the summer. Beyond the request for an explanation of the offer (not submitted by Beall), and the inquiry as to the agent’s proposed charge for commission it shows nothing except Mrs. Cutts’ knowledge that her daughter had been in consultation with Beall on the subject of the sale. Knowledge of or acquiescence in a different proposition, submitted forty-five days afterwards by Beall, could scarcely be rationally predicted of this cautious letter of inquiry.
These considerations would be sufficient to dispose of the case against the complainant. But the argument has been extended upon other features both of law and of fact arising out of the controversy; and we have been much urged to reconsider one of our decisions bearing upon the authority of real estate agents in conducting negotiations for the sale of land; and we will examine these further positions.
Assuming for the argument that Miss Cutts had such ah equitable interest in the lot as would authorize her to give a binding direction or assent to its sale, and that whatever she did was with the knowledge and acquiescence of her mother, we are to inquire whether it is shown that Beall was in fact authorized by the daughter to make the contract set-forth in Exhibit A, or whether Miss Cutts afterwards confirmed it.
In considering this it has been necessary to examine the *215 testimony as to the verbal authority alleged by Beall to have been given to him by Miss Cutts, and also the correspondence, by letter and telegraph between them. As to the verbal authority, it appears that Beall was fully aware, when talking with Miss Cutts, that she had already employed other real estate agents to sell the lot; and he admits that it was not at all unusual, with property owners in "Washington to place their property in the hands of several agents for sale, at the same time. Miss Cutts’ denial that she ever authorized Beall to sell the lot applies equally to the verbal communication, and no witness except Beall controverts this positive denial. But whatever verbal authority to sell absolutely may be claimed to have been intrusted ■to Beall in these personal interviews, would appear to have been terminated bjr Miss Cutts in her letter from. Brookline of June 16, in which she says: “I have been advised, unless there is some very advantageous offer for the lot, to wait now until the fall, when I shall return to Washington.”
Turning to the correspondence, which commences with a note from Adams & Beall on March 5, requesting an interview with Miss Cutts at their office, the first letter claiming attention is one written by her on April 9, in which she says if they have an offer of $5,700, or even less in cash, she would sell, as she desires to make an investment of the proceeds.
On the 23d of April the brokers advise her to offer her lot a little lower, say for $5,000. On the 12th of May they write that they had given an option “subject to approval of owner” on the lot for $5,200, one-third cash and the residue 'in deferred payments at the rate of thirty-five cents; and Mr. Beall says Miss Cutts, in reply to his letter, “ came into his office in person and ratified the option.” He wrote on the 15th of May that the option had been withdrawn and 'nothing more is heard of this negotiation.
Early in June, Miss Cutts and her mother left the city, and on the third and seventh of that month Adams & Beall *216 write to her, to the care of Mr. Storey, at Brookline, containing a request to be allowed to make a subdivision of the lot and offer the parts at designated prices, and asking to be informed whether she was willing to sell in this way; and stating that they had “ told purchasers to-day to give us an offer, etc., and we would submit it to you.” Then follows the letter of June 15, already given, written to Beall by Miss Cutts by mistake, and a letter of the next day from Miss Cutts, explaining the misunderstanding which had caused her mother to write that letter to Beall, and concluding with the statement quoted above that she had been advised, unless a very advantageous offer was made, to wait until her return in the fall.
The next communication of any importance is the following letter:
“July 21, ’86.
“Miss Lucia B. Cutts, Care M. Storey, Brookline, Mass-
“ My Dear Madam : I have a customer who desires to purchase the Columbia Heights lot owned by you for cash.
“Will you kindly wire me on receipt of this letter what your lowest cash price is for an immediate sale?
“ I would advise you to take a good fair profit on this lot, as I can readily find you investment for money now which will yield you a handsome profit in the next year.”
To this Miss Cutts replied:
“Northeast Harbor, Mt. Desert.
“ Mr. Beall.
“Dear Sir: Your letter was forwarded to me here, and I answer immediately, not being able to explain by telegraph. I had an offer for my lot last week at forty cents a foot, but finding property going up on Columbia Heights, decided with advice to ask higher. There have been two offers at thirty-five cents a foot recently. If the person is willing to give forty-five cents I will dispose of it; if not, think I will wait a little while until I return in the autumn.”
“Yours truly,
“ July 24-th.”
“Lucia B. Cutts.
*217 This letter was not received by Mr. Beall until the day after the execution of the contract of sale of the 31st July (Exhibit A), and of course could have had no effect in controlling his action in that transaction; nor as ratifying it, as it was written seven days before that agreement was made.
The letter of Beall of the 21st had stated that he had a customer who desired to purchase the lot for cash (italicized), had asked her to wire him her lowest cash price, and advised her “ to take a fair profit on the lot,” etc. Her reply of the 24th can only be regarded as responding to Beall's inquiry of the 21st as to the cash price and the remark in that reply that, “ If the person is willing to give forty-five cents, I will dispose of it,” must, of course, refer to an offer of that price in cash.
And she reiterates that in default of receiving that price (meaning in cash) she thinks she will wait until her return in the autumn; and her reason for holding this intention is explained by the statement that she believes the property was advancing in price.
We think there can be no doubt, upon the correspondence up to this point, that Beall was not, and never considered himself, authorized to sell upon any terms, however favorable, without a previous report, and distinct approval from Miss Cutts. It may be remarked that the customer referred to was not the complainant.
On the 30th of July, Beall telegraphed:
“Washington, D. C., July SO, ’6.
“Miss Lucia B. Cutts,
“ Northeast Harbor, Mt. Desert, Maine.
“ I can sell lot at forty-two cents — one-third cash, balance one and two years, 6 per cent. My commission $250. You will get net $6,050. Answer at once. I certainly advise you to accept, as plenty of good things are offering.
“John E. Beall.”
*218 And on the next day he received the following telegram in reply:
“Bab Harbob, Me., July SI.
“Adams & Beall,

“IfW F Street, Washington, D. C.

“ Decided to hold the lot at forty-five cents.
“Lucia B. Cutts.”
"We regard this reply as a simple rejection of the offer he had submitted for her approval and which he had advised her to accept. Miss Cutts was not bound to disclose in her reply all her reasons for the refusal to accept the proposal, beyond the insufficiency of the price. It was quite as probable that she should have objected to the proposed terms, which were to give a credit for two-thirds, at one and two years, with no retention of security on the land indicated in the offer, after she had expressed her desire to receive the entire purchase-money in cash, for the. purpose of making an investment, or to the amount of the commission charged. It was enough that she should express one reason why she declined to accept it, for that indicated a refusal.
But before a valid agreement can be made to devest the title to land, it must appear that the owner had agreed to the proposal in fact; and it is not sufficient that some other person erroneously supposed the owner had agreed, in face of the fact that he had not. Miss Cutts’ language is to be understood with respect to her information and her understanding of the situation. On the 29th of July, seven days before, she had, as we have construed her words, conditioned her acceptance of forty-five cents upon its being paid in cash; and having full reason to suppose that that letter had been received by Beall by the 31st instant, she had a right to believe that her mention of forty-five cents, in her telegram of that date, would be understood as a reiteration of the requirement of cash, for any sale.
But with no further instruction, Beall took the responsibility of signing the receipt of the 31st of July. The expres *219 sion “ if owner will ratify ” applies doubtless only to the form of the notes for the credit payments; but on the same day he telegraphed to Miss Cutts as follows:
“Washington, D. C., July 81, 1886.
“Lucia B. Cutts:
“ Sold lots for forty-five cents. Particulars by mail. Please confirm sale by wire. .
«John Beall.»
The last sentence is just wliat an agent would have written if he had known that his action would not be binding upon his principal without her confirmation; and if Beall had not called for her confirmation in this case, it would have been the first time during the negotiation he had abstained from asking her approval of whatever he proposed. If he had not felt the necessity of receiving her ratification of what he had undertaken to. do in her behalf, it is impossible to understand why he should have been ■ at such pains to obtain it, and by the speediest means of communication.
The remainder of the correspondence consists of the repudiation of the alleged sale, by Miss Cutts, in several letters, and of Mr. Beall’s assertion of his full authority to act as he did; but these subsequent communications are not important to the real inquiry and need not be recited here.
Upon the whole evidence we are all of 'the opinion that the complainant has failed to sustain his contention that Beall was employed by Miss Cutts to make the sale of the property upon the terms specified, even assuming that she h ad the power to commission him to do so; and that the utmost extent of any authority he possessed in the matter from her was to submit any proposition that he might receive, and ask, as he did in his telegram of the 31st, that she would “confirm the sale.”
That this view is in accordance with the decision of this Court in By on vs. McGee, 2 Mackey, 17, is conceded by the complainants; but it has been much urged that this ruling *220 is at variance with those in other jurisdictions on the subject, and that we should modify it to correspond with the weight of authority. Assuming such to be the state of the decisions elsewhere, we, nevertheless, think it entirely proper to adhere to what we have already deliberately decided; and which must have been appealed to by every land owner in the District as the settled law here, ever since it was announced five years ago by the General Term.
We can see no evil, and but slight inconvenience, at the worst, from its reiteration' as the proper rule; whereas a contrary ruling now would probably be productive of decided confusion and injury to the rights of the property holder. Under the custom prevalent here of employing at the same time several real estate agents to effect a sale it might frequently happen, as was the case in Kyon vs. McGee, that more than one such contract might be made with different purchasers on the same day; and between two parties thus claiming the purchase, it seems but a reasonable privilege that the real owner should have the right to decide to whom he will sell; for it might be that a purchaser acceptable to the broker might not be to the owner, who might seriously object to parting with his land to one obnoxious to him; or who might prove an-unwelcome neighbor, or a rival in the same business.
To limit the general authority of the real estate agent simply to the duty of finding a purchaser and reporting him to the owner, in our opinion is to confine this class of agents within the pi’oper bounds, A wider range of authority may be explicitly given where it is considered essential or proper by the owner; but in the absence of such special authority the general rule we have announced will prevail.

The decree is affirmed, with costs.